```
                                    ┌─────────────────────────────────┐
                                    │ USDC SDNY                       │
                                    │ DOCUMENT                        │
                                    │ ELECTRONICALLY FILED            │
                                    │ DOC #: _____         │
                                    │ DATE FILED: August 8, 2012      │
                                    └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
NANCY GEORGE, ROBERT GEORGE AND         :
RANDALL WHITMAN, on behalf of           :
themselves and all others similarly     :      11 Civ. 7533 (KBF)
situated,                               :
                                        :          OPINION & ORDER
                       Plaintiffs,      :
                                        :
           -v-                          :
                                        :
CHINA AUTOMOTIVE SYSTEMS, INC., et al., :
                                        :
                       Defendants.      :
----------------------------------------X

KATHERINE B. FORREST, District Judge:

        Lead Plaintiffs Nancy George, Robert George, and Randall

Whitman (collectively, "plaintiffs") bring this putative class

action against China Automotive Systems, Inc. ("CAAS") and

CAAS's former auditor, Schwartz Levitsky Feldman LLP ("SLF" and

with CAAS, "defendants"),[1] alleging violations of Section 10(b)

of the Securities Exchange Act of 1934 ("section 10(b)"), and

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule

10b-5").  Plaintiffs' claims are predicated upon allegedly false

or misleading misstatements in CAAS' filings with the Securities

and Exchange Commission ("SEC") regarding, inter alia, CAAS'

---

[1] In their Amended Complaint, plaintiffs name various of CAAS' officers and
directors as defendants (the "Individual Defendants").  (See Am. Compl. (Dkt.
No. 24) ¶¶ 18-23.)  There is no indication that those individuals have been
served, and counsel has not appeared on their behalf.  They are not before
the Court at this time and this Opinion does not consider the viability of
the claim asserted against them.  To the extent that those individuals'
actions are addressed in this Opinion, it is only to provide context as to
the facts alleged against CAAS.

accounting for certain convertible notes issued February 15, 2008 (the "Convertible Notes"), CAAS' operating expenses and other charges against income, SLF's audit of CAAS' financial statements regarding the accounting for the Convertible Notes, SLF's lack of a license to conduct audits in the People's Republic of China ("PRC"), and CAAS' internal controls.

CAAS and SLF have moved to dismiss the Amended Complaint-- CAAS on March 22, 2012, and SLF on April 27, 2012.  The former motion was fully submitted as of April 18, 2012; the latter, as of May 24, 2012.

Only July 6, 2012, plaintiffs separately moved for appointment of Pomerantz Haudek Grossman & Gross LLP ("PHGG") as co-lead counsel.  CAAS filed an opposition to the motion on July 23, 2012 (in which SLF joins); that motion was fully submitted as of August 2, 2012.

For the reasons set forth below, CAAS' motion to dismiss is DENIED; SLF's motion to dismiss is GRANTED; and plaintiffs' motion for appointment of PHGG as co-lead counsel is GRANTED.

I.    BACKGROUND

For purposes of ruling on the motion to dismiss, the Court accepts as true all well-pleaded allegations in the Amended Complaint and draws all reasonable inferences in plaintiffs' favor.  See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).  The Court also considers CAAS' SEC filings

referenced in the Amended Complaint, see Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); ATSI Commc'ns,

Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007), as

well as other documents of which it may take judicial notice,

such as certain 10b5-1 trading plans, see, e.g., Glaser v. The9,

Ltd., 772 F. Supp. 2d 573, 593 n.14.

    A.   The Parties

Plaintiffs are purchasers of CAAS securities, who bought

those securities sometime between May 12, 2009, and March 17,

2011 (the "Class Period").  (Am. Compl. (Dkt. No. 24) ¶¶ 1, 13.)

CAAS, a Delaware corporation headquartered in the PRC,

manufactures and sells power steering components and systems for

automobiles.  (Id. ¶ 14.)  CAAS stock trades on the NASDAQ.

(Id. ¶ 15.)  It is alleged that in 2003, CAAS entered the U.S.

market through a "reverse merger"--i.e., a process by which "a

private operating company based in the PRC is 'acquired' by a

previously registered U.S.-based publicly traded 'shell

company,' thereby bypassing the rigorous IPO process."  (Id.

¶¶ 5, 26.)

As discussed in note 1 supra, plaintiffs also name various

officers and directors of CAAS.  Hanlin Chen is alleged to have

been CAAS' Chairman and a member of its board of directors

during the relevant time period.  (Am. Compl. ¶ 18.)  Xi Liping

is alleged to be Chen's wife.  (Id. ¶ 19.)  It is alleged that

collectively, Chen and Liping sold nearly $10 million in CAAS'
shares during the Class Period.  (Id. ¶¶ 18-19.)  Qizhou Wu was
CAAS' CEO, President, and a member of the board of directors.
(Id. ¶ 20.)  Wu allegedly sold more than $13.4 million in CAAS'
shares during the Class Period.  (Id.)  Wong Tse Yiu, Wang
Shaobo, and Yu Shengbin are alleged to have been CAAS senior
vice presidents during the relevant time period, who,
collectively, sold nearly $20 million in CAAS' shares during the
Class Period--Yiu sold over $7.6 million; Shaobo sold $5.6
million, and Shengbin sold $5.2 million.  (Id. ¶¶ 21-23.)  Chen,
Liping, Wu, Yiu, Shaobo, and Shengbin are collectively referred
to as the "Individual Defendants."  As set forth in note 1
supra, they are not before the Court because they have not been
served.  Allegations relating to their stock sales are discussed
only to provide context to the allegations of fraud against
CAAS.

Defendant SLF, an accounting firm based in Toronto, Canada,
audited CAAS' financial statements during the Class Period.
(Id. ¶ 16.)  SLF resigned from that position in December 2011.
(Id.)  It is alleged that SLF audited a number of "Chinese
reverse merger companies," but was not licensed to conduct
audits in the PRC.  (Id. ¶¶ 2, 6.)

4

B.   <u>The Purportedly Fraudulent Misstatements and Omissions</u>

Plaintiffs posit five reasons as to why CAAS' annual and quarterly reports throughout the Class Period were false and misleading: (1) they repeatedly improperly acknowledged the importance of the accounting for the Convertible Notes, but then failed to apply the proper accounting principle; (2) they failed to account for certain operating expenses and other charges against income; (3) they failed to reveal "material deficiencies in internal controls"; (4) they failed to disclose that the financial results were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and (5) they failed to disclose that SLF was not licensed to conduct audits in the PRC and thus, ultimately would have to resign as auditor.  (Am. Compl. ¶¶ 2, 47.)

The primary focus of the Amended Complaint relates to the allegations regarding the allegedly improper accounting for the Convertible Notes.  The Convertible Notes were issued on February 15, 2008, pursuant to a February 1, 2008, Securities Purchase Agreement (the "SPA").  China Auto. Sys., Inc. (Form 8-K) at 1 (Feb. 1, 2008) ("Feb. 1 8-K") (Decl. of Neil R. Marder ("Marder Decl.") (Dkt. No. 28) Ex. B); <u>see also</u> China Auto. Sys., Inc. (Form 8-K) at 1 (Feb. 15, 2008) (Marder Decl. Ex. C). The SPA provided for the issuance of $35 million in senior, unsecured notes to two institutional investors with an original

principle amount of $35 million and common stock warrants to purchase 1,317,865 shares of common stock at an exercise price of approximately $8.85.  Feb. 1 8-K at 1 (Items 1.01, 2.03, 3.02).

Subsequent to the issuance of the Convertible Notes, CAAS disclosed the performance of the Convertible Notes in their Forms 10-K and 10-Q throughout the Class Period.  (See, e.g., Am. Compl. ¶¶ 33, 35, 37, 29, 42, 44, 46.)  The disclosures varied little among the SEC filings at issue in this action. (Compare Am. Compl. ¶ 33 with id. ¶¶ 35, 37.)  The disclosures read, in pertinent part:

> The Company has evaluated the convertible notes for terms and conditions that are not clearly and closely associated with the risks of the debt-type host instrument (see Note 12).  Generally, such features require separation from the host contract and treatment as derivative financial instruments. Certain features, such as the conversion option, were found to be exempt. Other features, such as puts and redemption features were found to require bifurcation and recognition as derivative liabilities.  These derivative liabilities are recognized initially at fair value, using forward cash-flow valuation techniques. As of February 15, 2008, the compound derivative value amounted to $1,703,962.  This derivative will be adjusted to its estimated fair value at the completion of each reporting period until the debt arrangement is ultimately settled, converted or paid. As of March 31, 2009, the compound derivative value amounted to $3,065,422.  The income from adjustment of fair value of compound derivative has been recorded in the income statement as gain or loss on change in fair value of derivative. (See note 12 and 24)

<u>See, e.g.</u>, China Auto. Sys., Inc. (Form 10-Q) (May 12, 2009) at 23 (for the period ended Mar. 31, 2009).

  C. <u>Disclosure of the Risk</u>

  On March 17, 2011, CAAS issued a press release in which it announced that

> it expected to restate its previously issued financial statements for fiscal year 2009 and the first three quarters of 2010 to reflect non-cash gains or losses related to the accounting treatment for the [Convertible Notes] based on the guidance outlined in Accounting Standard Codification (ASC) 815 ("ASC 815").

China Auto. Sys., Inc. (Form 8-K) (Mar. 17, 2011) at Ex. 99.1 (quoted in Am. Compl. ¶ 48).  CAAS disclosed that its treatment of the Convertible Notes failed to account for "an embedded conversion feature that allows for an adjustment to the conversion price in the event that the Company issues equity securities at a price lower than the original conversion price." <u>Id.</u>  According to CAAS, the accounting errors "did not result from any changes in the Company's internal accounting policies," or from "fraud or intentional misconduct."  <u>Id.</u>

  CAAS simultaneously disclosed that it would delay filing its annual 10-K for the 2010 fiscal year due to the "nature and timing of the review" of the restatement of the Convertible Notes.  China Auto. Sys., Inc. (Form 12b-25) at Part III (Mar. 17, 2011).

Plaintiffs allege that on March 17, 2011, those disclosures caused CAAS' stock price dropped $1.42 per share (i.e., approximately 14 percent), to close at $8.81.  (Am. Compl. ¶ 49.)

On March 18, 2011, CAAS disclosed that based upon its delay in filing a 10-K for the 2010 fiscal year, the NASDAQ had sent a letter stating that CAAS was not in compliance with listing requirements and providing CAAS until May 16, 2011 to submit a plan of compliance.  China Auto. Sys., Inc. (Form 8-K) at Ex. 99.1 (Mar. 21, 2011) (quoted in full at Am. Compl. ¶ 50).  On that announcement, CAAS' shares allegedly lost an additional $0.20 per share, closing at $8.61 on March 21, 2010.  (Am. Compl. ¶ 51.)

Plaintiffs allege that subsequent to PWC's "engagement in December 2010, and especially after its announcement of the impending earnings restatement in March 2011" (discussed further below), CAAS' stock lost 50 percent of its value through the end of the Class Period.  (Am. Compl. ¶ 55.)

D.   The Restatement

Plaintiffs allege that in December 2010 Price Waterhouse Cooper's "Chinese affiliate" ("PWC") replaced SLF as CAAS' auditor.  (Am. Compl. ¶¶ 6, 54.)  PWC issued the restatement of CAAS' financial in June 2011.  (Id. ¶ 7.)  According to plaintiffs, "as soon as" PWC reviewed the financial statements

prepared by SLF, it found that the financial statements did not properly take a charge against income for the cost of the Convertible Notes' conversion feature.  (Id. ¶ 55.)  It is also alleged, however, that PWC found additional "understatements of expenses."  (Id.)  That is, review of the financial statements for fiscal year 2009 revealed "accounting errors in accumulated depreciation, deferred tax assets and accrued payroll and its related cost."  China Auto. Sys., Inc. (Form 10-K/A) at 3 (June 24, 2011) (amended for the fiscal year ended Dec. 31, 2009).

The accounting errors regarding the Convertible Notes as well as the alleged "understatement of expenses" "represented material weaknesses in the Company's internal controls over financial reporting as of December 31, 2008 and 2009."  (Id.)  Specifically, the restated 2009 10-K identified two material weaknesses in internal controls:

1.  *The Company did not have sufficient personnel with appropriate levels of accounting knowledge and experience to address complex U.S. GAAP accounting issues, and to prepare and review financial statements and related disclosures under U.S. GAAP.*  Specifically, the Company's controls did not operate effectively to ensure the appropriate and timely analysis of and accounting for unusual and non-routine transactions and certain financial statement accounts, including, but not limited to, accounting and disclosure for the convertible notes and accounting for deferred taxes.

2.  *The Company did not have formalized closing procedures and adequate period-end review procedures to ensure a) proper preparation of the period-end financial statement closing entries and b) consistency of*

> *application of accounting policies and completeness*
> *and accuracy of the financial statement disclosures.*
> Specifically, the Company's controls did not operate
> effectively to ensure the appropriate and timely
> analysis and monitoring of the underlying information
> relating to its period-end financial reporting process
> and preparation of its consolidated financial
> statements.

Id. at 35.

E.   SLF's Alleged Violations of GAAS

Plaintiffs allege that the deficiencies in CAAS' 2009 annual and quarterly financial statements resulted from SLF's violations of Generally Accepted Accounting Standards ("GAAS"). In particular, the Amended Complaint alleges that SLF violated GAAS' third general standard, requiring auditors to "exercise professional due care in the performance of the audit and the preparation of the report."  AU § 150.02.  (Am. Compl. ¶ 58.) According to plaintiffs, SLF "knew or should have known" about how to properly account for the conversion feature in the Convertible Notes based upon the Financial Accounting Standards Board ("FASB")'s  issuance of EITF Issue No. 07-05 ("Determining Whether an Instrument (or Embedded Feature) Is Indexed to an Entity's Own Stock") in June 2008 (effective for financial statements issued for fiscal years after December 15, 2008). (Am. Compl. ¶ 56.)  See also China Auto. Sys., Inc. (Form 10-K) at 38 (for the fiscal year ended Dec. 31, 2008).[2]

---

[2] EITF Issue No. 07-5 has since been superseded by FASB Accounting Standards Codification Topic 105 (GAAP).  See FASB, "Pre-Codification Standards,"

Plaintiffs allege that the issuance of a new standard on how to treat derivative instruments such as the Convertible Notes should have caused SLF to exercise the "highest degree of professional skepticism" in its 2009 audit.  (Am. Compl. ¶ 59.) It is further alleged that the purported failure to properly account for the Convertible Notes demonstrates that SLF did not obtain the proper "audit evidence" to evaluate CAAS' financial statements.  (Am. Compl. ¶¶ 62, 63 (citing AU §§ 326.02, 326.25, 411.03).

With regard to the alleged "understatement of expenses", plaintiffs allege that as to the former, SLF "simply 'rubber stamped' its opinion" on CAAS financial statements.  (Am. Compl. ¶ 65.)  As to the purported material weaknesses in CAAS' internal controls, the Amended Complaint alleges that "the severity of the material weaknesses disclosed" in CAAS' restated 2009 10-K demonstrates that SLF had not obtained "sufficient understanding of the Company's internal control[s]."  (Id. ¶ 64.)

F.   Insiders' Sales of Stock and the 10b5-1 Plans

Plaintiffs allege that the Individual Defendants collectively sold over $40 million in CAAS shares during the Class Period in order to profit from the allegedly inflated

---

http://www.fasb.org/jsp/FASB/Page/PreCodSectionPage&cid=1218220137031#eitf07 (last visited July 19, 2012).

value of CAAS stock.  (Am. Compl. ¶¶ 17, 68.)  Plaintiffs allege
that Chen (CAAS' Chairman and a director) sold $596,745 worth of
CAAS shares during the Class Period and that Liping--Chen's
wife--made Class Period sales worth $9.3 million.  (Id.
¶¶ 18-19.)  Wu, CAAS' CEO, sold over $13 million in CAAS shares
during the Class period, and the three senior vice presidents--
Yiu, Shaobo, and Shengbin--sold $7.6 million, $5.6 million, and
$5.2 million worth of CAAS shares, respectively.  (Id.
¶¶ 20-23.)

     The majority of those sales were purportedly made pursuant
to what are known as "10b5-1 plans"--i.e., stock trading plans
entered into pursuant to Rule 10b5-1.  (See Marder Decl. Exs.
H-P (10b5-1 plans for the Individual Defendants).)  The
Individual Defendants entered into those plans during the Class
Period, but prior to their sales of CAAS stock.  (See id. (e.g.,
Ex. H (10b5-1 trading plan of Hanlin Chen with a start date of
July 19, 2010), Ex. K (10b5-1 trading plan of Liping Xie entered
into Nov. 26, 2009)).)

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

     To survive a Rule 12(b)(6) motion to dismiss, "the
plaintiff must provide the grounds upon which [its] claim rests
through factual allegations sufficient 'to raise a right to
relief above the speculative level.'"  ATSI Commc'ns, Inc., 493

F.3d at 98 (quoting Bell Alt. Corp. v. Twombly, 550 U.S. 544,
555 (2007)).  In other words, the complaint must allege "enough
facts to state a claim to relief that is plausible on its face."
Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (quoting
Twombly, 550 U.S. at 570).  See also Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009) (same).  "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged."  Iqbal, 556 U.S. at 678.  In applying
that standard, the court accepts as true all well-plead factual
allegations, but does not credit "mere conclusory statements" or
"threadbare recitals of the elements of a cause of action."  Id.
If the court can infer no more than "the mere possibility of
misconduct" from the factual averments, dismissal is
appropriate.  Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at
679).

    B.    Pleading Standards

    Along with the requirements of Rule 12(b)(6), a complaint
alleging securities fraud must satisfy the requirements of both
Rule 9(b) of the Federal Rules of Civil Procedure, and the
Private Securities Litigation Reform Act ("PSLRA")--i.e., it
must plead "with particularity the circumstances constituting
fraud."  ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP
Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

1.   Rule 9(b)

Rule 9(b) requires that a plaintiff "state with
particularity the circumstances constituting fraud or mistake."
Fed. R. Civ. P. 9(b).  A complaint predicated upon fraud must
"(1) specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements
were fraudulent."  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir
2004) (quotation marks omitted).  Failure to do so requires
dismissal of the complaint.  Id.

2.   PSLRA

The PSLRA expanded on Rule 9(b)'s requirements by mandating
a uniform national pleading standard for securities fraud
actions.  See Stoneridge Inv. Partners, LLC v.
Scientific-Atlanta, 552 U.S. 148, 165 (2008).  "The statute
insists that securities fraud complaints 'specify' each
misleading statement; that they set forth the facts 'on which
[a] belief' that a statement is misleading was 'formed'; and
that they 'state with particularity facts giving rise to a
strong inference that the defendant acted with the required
state of mind.'"  Dura Pharms., Inc. v. Broudo, 544 U.S. 336,
345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1)).  "Therefore, while
we normally draw reasonable inferences in the non-movant's favor
on a motion to dismiss, the PSLRA establishes a more stringent

14

rule for inferences involving scienter because the PSLRA
requires particular allegations giving rise to a strong
inference of scienter." ECA & Local 134, 553 F.3d at 196
(quotation marks omitted).  The Second Circuit requires that
plaintiffs "must do more than say that the statements . . . were
false and misleading; they must demonstrate with specificity why
and how that is so." Rombach, 355 F.3d at 174; accord ATSI
Commc'ns, Inc., 493 F.3d at 99.[3]

     C.   Section 10(b) and Rule 10b-5

Section 10(b) creates civil liability for those who

> use or employ, in connection with the purchase or sale
> of any security . . . any manipulative or deceptive
> device or contrivance in contravention of such rules
> and regulations as the [SEC] may prescribe as
> necessary or appropriate in the public interest or for
> the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5--promulgated by the SEC
implementing section 10(b)--prohibits the making of "any untrue
statement of a material fact or to omit to state a material fact
necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading."  17
C.F.R. § 240.10b-5(b).

---

[3] Although it is well-settled that Rule 9(b) and the PSLRA's heightened
pleading standards apply to allegations regarding the misstatements
underlying the fraud, the Second Circuit has recently explained that other
Circuits are split as to whether Rule 8(a) or 9(b) applies to allegations of
loss causation.  Acticon AG v. China N. East Petroleum Holdings Ltd., ---
F.3d ---, 2012 WL 3104589, at *3 (2d Cir. Aug. 1, 2012).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  Stoneridge Inv. Partners, LLC, 552 U.S. at 157.

Defendants raise issues only with respect to the elements of scienter and loss causation.

1.  Scienter

Under the PSLRA, well-pled allegations of scienter must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" ECA & Local 134, 553 F.3d at 198 (quoting Tellabs, 551 U.S. at 313).  To qualify as "strong," "the inference of scienter must be more than merely plausible or reasonable--it must cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 313.  To determine if scienter is adequately alleged, the Court asks, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of

16

scienter at least as strong as any opposing inference?"  Id. at 325.

The requisite "strong inference" of scienter can be established by alleging facts showing (a) defendants' "motive and opportunity" to commit the alleged fraud, or (b) strong circumstantial evidence of conscious misbehavior or recklessness.  ATSI Commc'ns, Inc., 493 F.3d at 99.  In other words, plaintiffs need only show one or the other--not both.

"Motive" may be shown with plausible allegations that defendants "benefitted in some concrete and personal way from the purported fraud."  Novak v. Kasaks, 216 F.3d 300, 307-078 (2d Cir. 2000).  Motives common to most corporate officers-- e.g., the desire for the corporation to be profitable and to keep the stock price high--will not do.  ECA & Local 134, 553 F.3d at 198.  Instead, a plaintiff may demonstrate "motive" where "corporate insiders allegedly ma[d]e a misrepresentation in order to sell their own shares at a profit."  Id.

Scienter based upon conscious misbehavior requires a "showing of 'deliberate illegal behavior.'"  Gould v. Winstar Commc'ns, Inc., --- F.3d ---, 2012 WL 2924254, at *7 (2d Cir. July 19, 2012) (quoting Novak, 216 F.3d at 308).  The Second Circuit has found that recklessness--i.e., "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the

17

defendant must have been aware of it," <u>South Cherry Street, LLC</u>, 573 F.3d at 109 (quotation marks and alterations omitted)--is also a "sufficiently culpable mental state for securities fraud," <u>ECA & Local 134</u>, 553 F.3d at 198.

The Second Circuit has enumerated four circumstances that "may give rise to a strong inference" of fraudulent intent-- where the defendant:

> "(1) benefited in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3) knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information they had a duty to monitor . . . ."

<u>South Cherry St., LLC v. Hennessee Group LLC</u>, 573 F.3d 98, 110 (2d Cir. 2009) (quoting <u>Novak</u>, 216 F.3d at 311).  Those examples are merely illustrative, not exhaustive, of facts needed to sustain a 10(b) claim on a motion to dismiss.  <u>See</u> <u>ECA & Local 134</u>, 553 F.3d at 199.

### 2.   Loss Causation

The PSLRA requires that "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  That requirement is referred to as "loss causation."  <u>Dura Pharms, Inc.</u>, 544 U.S. at 342.  "Loss causation is the causal link

between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir. 2005); see also Dura Pharms., Inc., 544 U.S. at 342 ("'loss causation,' i.e., a causal connection between the material misrepresentation and the loss"). However, allegations of an "inflated purchase price" of a defendant-company's stock is insufficient to establish the requisite causal link. See generally Dura Pharms., Inc., 544 U.S. 336. To plead loss causation adequately, a plaintiff must allege (a) the foreseeability of the loss--i.e., that "the risk that cause the loss was within the zone of risk concealed by the misrepresentations or omissions," and (b) that disclosure of the risk that had concealed the purported misrepresentations negatively impacted the value of the securities at issue. Lentell, 396 F.3d at 172 (emphasis omitted).

III. DISCUSSION

CAAS and SLF each argue that the Amended Complaint does not adequately plead scienter or loss causation.

A.   CAAS

1.   Scienter

CAAS argues that plaintiffs have failed to plead sufficient facts giving rise to the requisite "strong inference" of fraudulent intent--i.e., plaintiff have not sufficiently alleged either motive or opportunity or strong circumstantial evidence

19

of conscious misbehavior or recklessness.  Here, the Court
considers plaintiffs' allegations regarding the Individual
Defendants' intent (even though they are not parties to this
action) to determine whether any such conduct should be imputed
to CAAS.  See Teamsters Local 445 Freight Div. Pension Fund v.
Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("When the
defendant is a corporate entity . . . the pleaded facts must
create a strong inference that someone whose intent could be
imputed to the corporation acted with the requisite scienter.
In most cases, the most straightforward way to raise such an
inference for a corporate defendant will be to plead it for an
individual defendant.").

    Plaintiffs' allegations of motive are based upon the
Individual Defendants' sales of their CAAS stock.  (See Am.
Compl. ¶¶ 3-4, 17-23.)  No inference of scienter may be drawn
from insider trading activity unless it is found that such
activity is "unusual."  Acito v. IMCERA Group, Inc., 47 F.3d 47,
54 (2d Cir. 1995).  "Factors considered in determining whether
insider trading activity is unusual include the amount of profit
from the sales, the portion of stockholdings sold, the change in
volume of insider sales, and the number of insiders selling."
In re Scholastic Corp. Secs. Litig., 252 F.3d 63, 74-75 (2d Cir.
2001).

CAAS argues that the sales at issue were not "unusual"--
i.e., do not evidence "motive" sufficient to show scienter--
because more than two-thirds of those sales were made pursuant
to the 10b5-1 plans and the remaining sales are too small a
fraction of total sales to establish "unusual" trading.  (See
Mem. of Law in Support of Def. [CAAS'] Mot. to Dismiss ("CAAS
Mem.") (Dkt. No. 27) at 9-10 & n.8.)

"[I]t is well-established that trades under [a] 10b-5-1
plan do not raise a strong inference of scienter."  Glaser, 772
F. Supp. 2d at 592 (quoting In re Gildan Activewear, Inc. Sec.
Litig., 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)); In re
IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 604
(S.D.N.Y. 2007) ("Because Barton's sales were part of a periodic
divestment plan [i.e., at 10b5-1 sales plan], the timing and
amount of sales do not raise a strong inference of scienter.").
That axiom does not apply, however, where a 10b5-1 plan is
entered into--or strategically amended--to take advantage of an
inflated stock price or insider information.  See In re CRM
Holdings, Ltd. Secs. Litig., No. 10 Civ. 975, 2012 WL 1646888,
at *25 (S.D.N.Y. May 10, 2012) (discussing In re Countrywide
Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044 (C.D. Cal.
2008)).  Indeed, where (as here) 10b5-1 trading plans are
entered into during the class period, they "are not a cognizable
defense to scienter allegations on a motion to dismiss."

Freudenberg v. E*Trade Fin'l Corp., 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2011) (collecting cases).

Here, there is no dispute that the 10b5-1 trading plans were entered into during the Class Period. (See Marder Decl. Exs. H-P.)  Thus, CAAS may not invoke the plans' existence to disarm any inference of scienter raised by the Individual Defendants' sales of CAAS stock.

In the absence of that defense, the Court considers whether the Individual Defendants' trading was "unusual" in "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  In re Scholastic Corp. Secs. Litig., 252 F.3d at 74-75.  On the facts plead, the Court finds that it was.

First, the Individual Defendants made a collective net profit of nearly $42 million--only slightly less than the amounts received for their shares sold during the Class Period. (See Decl. of Tamar A. Weinrib in Support of Lead Pls.' Mem. in Opp'n to the Mot. to Dismiss ("Weinrib Decl.") (Dkt. No. 33) Ex. 3.)  CEO Wu individually earned a net profit of approximately $13.45 million and his wife, approximately $9.3 million; while senior vice presidents Shaobo and Yiu obtained net profits of $5.6 million and $7.61 million, respectively.  (Id.)

Second, four of the seven Individual Defendants sold over 50 percent of their CAAS stock during the class period and two

of the remaining Individual Defendants sold over 25 percent of
their shares. (See Weinrib Decl. Ex. 3.)

Third, in the year and a half prior to the Class Period,
those same Individual Defendants did not sell any CAAS stock,
whereas collectively they sold more than 2.3 million shares
during the Class Period. (Weinrib Decl. Ex. 5.) Those same
Individual Defendants have not sold any stock since March 17,
2011--i.e., the end of the Class Period. (Id.) Those facts,
taken together, demonstrate "concrete and personal benefits"
sufficient to establish "motive" at this stage of the
proceedings.

The Amended Complaint suggests that at a minimum least Chen
as CAAS' Chairman and Director and Wu as CEO would have been in
"in a position to access confidential information." (See Am.
Compl. ¶¶ 18, 20.) See also In re Scholastic Corp. Secs.
Litig., 252 F.3d at 75. (The same applies to Xie Liping, who is
Chen's wife and to whom Chen's access to insider information may
be imputed, and who herself made significant stock sales during
the Class Period. (Am. Compl. ¶ 19.)) That access coupled with
the circumstances of the Individual Defendants' stock sales
demonstrates "unusual" trading activity to demonstrate motive
and opportunity at this stage. See Acito, 47 F.3d at 54.

CAAS seeks to defeat the inference of scienter raised by
the trading activity by arguing that the alleged accounting

23

errors and misstatements regarding internal controls are insufficient to sustain a securities fraud claim. (<u>See</u> CAAS Mem. at 13-14; Reply Mem. in Support of CAAS Mot. to Dismiss ("CAAS Reply") (Dkt. No. 34) at 3-6.)  That argument ignores that plaintiffs' allegations of the Individual Defendants' stock sales raise a strong inference of scienter by pleading "motive and opportunity"--not conscious misbehavior.  Indeed, in all of the cases cited by CAAS in support of this argument, the plaintiffs failed to plead motive and opportunity and thus, the courts there examined whether the plaintiff had pleaded scienter by alleging conscious misbehavior.  See <u>In re Bristol-Myers Squibb Secs. Litig.</u>, 312 F. Supp. 2d 549, 560-62, 565-68 (S.D.N.Y. 2004); <u>Funke v. Life Fin. Corp.</u>, 237 F. Supp. 2d 458, 466-468 (S.D.N.Y. 2002); <u>Ley v. Visteon Corp.</u>, 543 F.3d 801, 812, 814 (6th Cir. 2008) (all cited in CAAS Reply at 4-5). Plaintiffs need only plead <u>either</u> motive and opportunity <u>or</u> conscious misbehavior; they need not plead <u>both</u>.  See <u>ATSI Commc'ns, Inc.</u>, 493 F.3d at 99.  Because plaintiffs have sufficiently pled motive and opportunity, they need not plead conscious misbehavior or recklessness.  CAAS' argument regarding whether the alleged accounting violations is immaterial at this stage.

Accordingly, the Amended Complaint sufficiently pleads the "strong inference" of scienter.

24

        2.   Loss Causation

     Plaintiffs allege that three disclosures caused the alleged
loss in value of their CAAS securities:  (a) CAAS' March 17,
2011 disclosure of the need for a restatement of its 2009 and
2010 financial statements regarding the Convertible Notes,
causing CAAS' stock to drop 14 percent and close at $8.81 on
March 17 (Am. Compl. ¶ 49); (b) the March 18, 2011 disclosure of
the NASDAQ's letter regarding CAAS' failure to comply with
NASDAQ listing requirements, which allegedly precipitated a two
percent drop in CAAS' stock (to $8.61 per share) (id. ¶ 51); and
(c) the announcement (on December 13, 2010) that PWC had been
engaged to replace SLF, after which CAAS' stock declined 50
percent in value over the remainder of the Class Period (id.
¶ 55); see also China Auto. Sys., Inc. (Form 8-K) at 2, Ex. 99-1
(Dec. 13, 2011).  CAAS makes a number of arguments as to
plaintiffs' failure to plead loss causation adequately.

     First, CAAS argues that its stock price "declined steadily
throughout the class period--prior to the alleged corrective
disclosure on March 17, 2011."  (CAAS Mem. at 16.)  Although
historical stock prices[4] indicate that CAAS' stock price was on a
"downward trend," it is clear that that trend began sometime
after December 13, 2010--the day that CAAS issued a Form 8-K

_____

[4] The Court takes judicial notice of CAAS' historical stock prices.  See
Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 n.8 (2d Cir. 2000).  The
Court is using stock prices from Google.com.

announcing SLF's resignation and its replacement with PWC.
Plaintiffs do allege that the December 13 announcement spurred
the decline in CAAS' stock price, but they also allege that two
corrective disclosures in March 2011 caused CAAS' stock to drop.
In other words, plaintiffs have, at this stage, adequately
pleaded that the purported misrepresentations--i.e., that CAAS'
financial statements accurately accounted for the Convertible
Notes--negatively impacted the value of the securities at issue.
See Lentell, 396 F.3d at 172; see also Acticon AG v. China N.
East Petroleum Holdings, Ltd., --- F.3d ---, 2012 WL 3104589, at
*5 (2d Cir. Aug. 1, 2012) (loss causation adequately pleaded
where the plaintiff had "allege[d] that the price of NEP stock
dropped after the alleged fraud became known").[5]

Second, CAAS argues that plaintiffs cannot show the
"requisite causal link" between the alleged misstatements and
the drop in CAAS' stock price because there was a separate
market factor that impacted the stock--namely, "significant
public scrutiny" of "Chinese Reverse Merger Companies," like
CAAS, which caused a decline in the respective stock prices of
those companies.  (CAAS Mem. at 19-20.)

---

[5] In re Security Capital Assurance, Ltd. Secs. Litig., 729 F. Supp. 2d 569
(S.D.N.Y. 2010), on which CAAS relies for the "slow decline" argument, is
distinguishable.  There, "Plaintiff's Complaint fail[ed] even to demonstrate
a correlation between 'revealed' facts and a decline in SCA's stock price."
Id. at 599; see also id. (noting a rise in SCA's stock price after alleged
"corrective disclosures").  Here, plaintiffs have tied the alleged corrective
disclosures to a drop in CAAS' stock price.

It is true that the Supreme Court has recognized that where there is a purchase-sale time disparity, the lower price of the securities on which the plaintiff's loss causation theory rests could have resulted from "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." Dura Pharms., Inc., 544 U.S. at 342-34.  The Second Circuit likewise has held that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases"--i.e., a 10(b) claim fails on a motion to dismiss when the plaintiff "has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as alleged to intervening events." Lentell, 396 F.3d at 174 (quotation marks omitted).[6]  Those observations, however, do not necessarily mean that anytime alleged loss in the value of securities coincides with a marketwide event that precipitated a downturn in the financial markets, a plaintiff cannot adequately plead loss causation.  That would produce an absurd result, indeed.  See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("We do not meant to suggest that is all cases a fraud plaintiff will be unable to

---

[6] The Second Circuit has (in the same opinion) recognized that loss causation "is a fact-based inquiry." Lentell, 396 F.3d at 174 (quotation marks omitted).

plead proximate cause when the claim follows a market collapse. In this case, it is the cumulative effect of the considerations discussed above, <u>rather than any single factor</u>, that compels our decision." (emphasis added)).[7]

As Judge Schiendlin has aptly stated:

> Neither <u>Dura</u> nor <u>Lentell</u>, however, imposes on plaintiffs the heavy burden of pleading 'facts sufficient to <u>exclude</u> other non-fraud explanations. . . . [N]either <u>Lentell</u> nor <u>Dura</u> burden plaintiffs with pleading that <u>no other possible</u> event could have caused plaintiffs' losses . . . In other words, <u>Lentell</u> does not say that the existence of a market-wide phenomenon necessarily <u>eliminates</u> a plausible causal connection between plaintiffs' losses and defendants' alleged fraud.

<u>King Cnty., Wash. v. IKB Deutsche Industriebank AG</u>, 708 F. Supp. 2d 334, 342-43 (S.D.N.Y. 2010).

Courts granting motions to dismiss based upon the plaintiff's failure to plead loss causation due to a coinciding "marketwide phenomenon," did so where the stock of the defendant-company was "clearly linked" to a large-scale market event, such as the collapse of the housing market. <u>See, e.g.</u>, <u>Kuriakose v. Fed. Home Loan Mortg. Corp.</u>, No. 08 Civ. 7281, 2011 WL 1158028, at *13-14 (S.D.N.Y. Mar. 30, 2011). However, courts have found loss causation adequately pled even where a stock price collapsed contemporaneously with the current credit crisis (<u>i.e.</u>, the "global liquidity crisis that began in the summer of

---

[7] The Second Circuit drew the "marketwide phenomenon" language in <u>Lentell</u> from the discussion of loss causation in <u>First Nationwide Bank</u>. <u>Lentell</u>, 396 F.3d at 174 (quoting <u>First Nationwide Bank</u>, 27 F.3d at 772).

2007" when the U.S. housing market collapsed).  See, e.g., King Cnty., Wash., 708 F. Supp. 2d at 340, 343.

Although Chinese Reverse Merger Companies have faced "public scrutiny" (indeed the Amended Complaint acknowledges as much), "[t]o hold that plaintiffs failed to plead loss causation solely because [other Chinese Reverse Merger Companies' stock dropped] contemporaneously" with CAAS' stock price decline "would place too much weight on one single factor." King Cnty., Wash., 708 F. Supp. 2d at 343.  The Court declines to do so here and will allow discovery to build a factual record as to which of "the tangle of [other] factors" may have affected CAAS' stock price.  See Dura Pharms., Inc., 544 U.S. at 342.

Third, CAAS' argument that plaintiffs have "cherrypicked" dates of corrective disclosure in support of their loss causation allegations likewise does not have merit.  The case on which CAAS relies for that proposition, In re Security Capital Assurance, Ltd., discussed "cherrypicking" in the context of whether the housing crisis contributed to the plaintiffs' loss, 729 F. Supp. 2d at 602, and ultimately held that because (as discussed in n.5 supra) the plaintiffs had failed to tie certain of the alleged corrective disclosures to drops in stock price (and instead, the stock price rose after certain of those disclosures) as well as left "wide periods unaccounted for," the

plaintiffs had failed to plead loss causation.  That is not the case here.

Fourth, CAAS' argument that plaintiffs cannot show loss causation because CAAS' stock price rose subsequent to the Class Period (CAAS Mem. at 17) is foreclosed by the Second Circuit's August 1, 2012 decision in Acticon AG, 2012 WL 3104589, in which the Second Circuit held that recovery of stock price subsequent to the class period "does not negate the inference that [the plaintiff] has suffered economic loss."  Id. at *7.

Accordingly, plaintiffs have adequately pleaded loss causation.

B.   SLF

1.   Scienter

SLF argues that plaintiffs have failed to plead SLF's conscious misbehavior or recklessness and thus, have failed to plead scienter adequately.[8]  SLF asserts that plaintiffs' allegations plead only SLF's failure to exercise professional care (i.e., negligence).  (See Mem. of Law in Supp. of Def. Auditor's Mot. to Dismiss ("SLF Mem.") (Dkt. No. 39) at 7-10.) Plaintiffs argue that the allegations regarding SLF's treatment of the Convertible Notes indeed plead SLF's recklessness.

---

[8] Plaintiffs implicitly concede that they are not putting forward a "motive and opportunity" theory of scienter against SLF.  (Lead Pls.' Mem. of Law In Opp'n to SLF's Mot. to Dismiss ("Pls. SLF Opp'n") (Dkt. No. 44) at 14-15.)

"For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care." Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000) (quotation marks omitted); see also Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996).  In order to evidence scienter, recklessness "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." Rothman, 220 F.3d at 98; see also South Cherry St., LLC, 573 F.3d at 110 (same).

The inference of scienter is more compelling than any competing inference of non-fraudulent intent where a plaintiff pleads facts demonstrating that

> [t]he accounting practices were so deficient that they amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 511 (S.D.N.Y. 2011) (quotation marks omitted).

Reduced to their essence, plaintiffs' allegations of SLF's recklessness are four-fold: (1) that SLF violated a "known and unambiguous accounting rule"--ASC 815 (codifying EITF 07-05) in

31

accounting for the Convertible Notes (see, e.g., Am. Compl.
¶¶ 58-59, 63); (2) that SLF failed to detect "material
deficiencies in CAAS' internal financial controls" (id. ¶ 2);
(3) that SLF "simply 'rubber stamped' its opinion" on CAAS'
financial statements, which allowed CAAS to "understate[]"
operating expenses (id. ¶ 65); and (4) that SLF failed to
disclose that it was not licensed to conduct audits in the PRC,
meaning that it inevitably would have to resign (id. ¶¶ 2, 6,
68(ii)).

First, allegations that SLF violated a "known and
unambiguous accounting rule," without more, do not evidence
recklessness.  See ECA & Local 134, 553 F.3d at 200
("[A]llegations of GAAP violations or accounting irregularities,
standing alone, are insufficient to state a securities fraud
claim."); Novak, 216 F.3d at 309 (an auditor's failure to comply
with GAAP or to detect other accounting irregularities did not
constitute recklessness, absent evidence of "corresponding
fraudulent intent").  Plaintiffs argue, however, that the timing
and magnitude of the restatement provide the "evidence of
corresponding fraudulent intent" necessary to raise a
"compelling inference" of fraudulent intent.  ((Lead Pls.' Mem.
of Law In Opp'n to SLF's Mot. to Dismiss ("Pls. SLF Opp'n")
(Dkt. No. 44) at 18-20.)

It is true that write-offs or corrections of a large
magnitude have been found, when coupled with <u>other</u> allegations
evidencing a non-fiduciary auditor's scienter,[9] to support an
inference of recklessness, <u>see, e.g.</u>, <u>In re Scholastic Corp.
Secs. Litig.</u>, 252 F.3d at 77; <u>Rothman</u>, 220 F.3d at 92 ("the
magnitude of th[e] write-off renders less credible" defendants
argument that they did not act recklessly, when coupled with
allegations of poor sales); <u>In re Bear Stearns Cos., Inc. Secs.,
Derivative, & ERISA Litig.</u>, 763 F. Supp. 2d 423, 517 (S.D.N.Y.
2011) ("[T]he magnitude of the alleged fraud provides some
additional circumstantial evidence of scienter." (quotation
marks omitted)); <u>In re Bristol-Myers Squibb Secs. Litig.</u>, 312 F.
Supp. 2d 549, 565 (S.D.N.Y. 2004) (quotations marks and
alterations omitted) ("a Restatement of financial results . . .,
without corresponding fraudulent intent, [is] not sufficient to
state a securities fraud claim"), as does the quick discovery of
an alleged error in the defendant-company's financial
statements,  <u>In re Bear Stearns Cos.</u>, 763 F. Supp. 2d at 517
("The Securities Complaint has alleged that JPMorgan discovered
in the course of one weekend the overvaluation of assets and
underestimation of risk exposure in Bear Stearns' financial

---

[9] To raise a plausible, compelling inference of scienter against a non-
fiduciary auditor are "the nature and extent of the client's fraudulent
accounting and the accountant's failure to conduct a thorough and objective
audit." <u>In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.</u>, 763
F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (quotation marks and alterations
omitted).

statements.  . . .  These allegations support an inference of Deloitte's scienter."); see also In re New Century, 588 F. Supp. 2d 1206, 1231, 1236 (C.D. Cal. 2008) ("[T]he rapid discovery of the alleged accounting violations [i.e., within months of the new CEO taking office] are further support for the several strong inferences that KPMG's audit contained deliberately reckless misstatements regarding New Century's accounting practices." (emphasis added)).

Although plaintiffs allege that PWC was able to determine the need to restate the Convertible Notes within three months of taking over as CAAS' auditor (see Am. Compl. ¶¶ 48, 54-55), plaintiffs' argument regarding the size of the restatement is contained only in its opposition to SLF's motion to dismiss (i.e., is not alleged in the Amended Complaint).  Plaintiffs argue that the Convertible Notes "were the largest financial instruments on the Company's balance sheet" (Pls. SLF Opp'n at 18) and that the restatement reduced net income for the May 12, 2009 through March 17, 2011 class period by more than $39 million--i.e., 62 percent (id. at 21).  It is axiomatic, however, that a plaintiff cannot amend a complaint with new allegations contained in an opposition to a motion to dismiss. In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001).  Thus, as to the question of the timing and size of the restatement, the Court can only refer to the

allegations regarding PWC's discovery of the purported accounting deficiencies regarding the Convertible Notes contained in the Amended Complaint as it currently stands. <u>See id.</u>

Second, with regard to plaintiffs' allegations of SLF's audit of the expenses--<u>i.e.</u>, that SLF "rubber stamped" CAAS' financial statements, those are wholly conclusory and cannot be credited on this motion. The Amended Complaint provides nothing in the way of plausible allegations supportive of that "rubber stamping" and that allegation cannot support SLF's inference of scienter. Additional, plausible allegations in that regard would contribute to the picture that SLF conducted an audit that amounted to "no audit at all."

Third, as to the internal control allegations, it is well-established that "the failure of a non-fiduciary accountant to identify problems with the defendant-company's internal controls and accounting practices <u>does not</u> constitute reckless conduct sufficient for § 10(b) liability." <u>Novak</u>, 216 F.3d at 309 (emphasis added).

Fourth, plaintiffs also argue, without any caselaw support, that the fact that SLF was unlicensed to conduct audits in China is further evidence of scienter. (Pls. SLF Opp'n at 21.) SLF argues only in both its opening and reply memoranda ("for purposes of context alone") that auditors were not required to

be licensed in China specifically until 2011--i.e., after SLF
resigned as CAAS' auditor.  (See SLF Mem. at 12-13; Reply Mem.
of Law in Further Support of Def. Auditor's Mot. to Dismiss
(Dkt. No. 46) at 5-6.)  Plaintiffs do not challenge that
assertion in anyway.  (See Pls. SLF Opp'n at 21.)  The Court
finds that, for purposes of this motion only, plaintiffs are
deemed to have conceded that point.  Cf. Lipton v. Cnty. Of
Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("The
Court may, and generally will, deem a claim abandoned when a
plaintiff fails to respond to a defendant's arguments that the
claim should be dismissed.").  Without anything evidencing
fraudulent intent behind SLF's conducting audits of CAAS'
financial statements without a license to practice in China,
such allegations cannot provide the "corresponding evidence" of
scienter necessary to sustain a section 10(b) claim.

        Plaintiffs argue continuously, without citation to any
specific allegations in the Amended Complaint, that the
inference of scienter against SLF arises not only from its duty
to investigate regarding the proper accounting for the
Convertible Notes, but also from various "red flags."  Without
any indication in the Amended Complaint of what those red flags
are, this Court cannot credit them on a motion to dismiss.

        All of what is alleged in the Amended Complaint--i.e.,
SLF's failure to comply with GAAS, its "rubber stamp[ing]" of

CAAS' financial statements with regards to the operating
expenses, and SLF's failure to detect deficiencies in internal
controls--do not collectively raise the requisite strong
inference of fraudulent intent.  They do not demonstrate
anything evidencing SLF's "actual intent to aid [CAAS] in the
fraud."  Rothman, 220 F.3d at 98; see also South Cherry St.,
LLC, 573 F.3d at 110.

However, the fact that the Convertible Notes were the
largest financial instrument on CAAS' books and that the
restatement amounted to an more-than 50 percent change--if
either of them were plead in a complaint such that the Court
could accept them as true for purposes of a motion to dismiss--
might, when coupled with allegations of the Individual
Defendants' "unusual" stock sales, lead to a compelling
inference of such intent on SLF's part--i.e., that SLF's
allegedly faulty accounting for the Convertible Notes which
coincided with the Individual Defendants' sales of CAAS stock (a
matter of public record) amounts to "an egregious refusal to see
the obvious."  See In re Bear Stearns Cos., Inc. Secs.,
Derivative, & ERISA Litig., 763 F. Supp. 2d at 511.  In
addition, plausible allegations of the magnitude of SLF's
alleged accounting errors with respect to the Convertible Notes,
when taken with allegations regarding SLF's failure to properly
account for operating expenses and recognize deficiencies in

SLF's internal controls, might be sufficient to support a claim at the pleading stage that SLF's audit "amounted to no audit at all." See id. As the Amended Complaint stands, however, plaintiffs have failed to put forward plausible allegations raising a compelling inference of SLF's scienter.

Failure to plead scienter requires dismissal of a federal securities fraud claim under section 10(b) and Rule 10b-5. Accordingly, SLF's motion to dismiss is granted.[10]

IV.  LEAVE TO AMEND

Plaintiffs seek leave to replead to correct any deficiencies the Court finds in the Amended Complaint.

Rule 15(a) of the Federal Rules of Civil Procedure requires that leave to amend be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2).  A determination on the proprietary of repleading is left to the sound discretion of the court.  Joblove v. Bar Labs. Inc. (In re Tamoxifen Citrate Antitrust Litig.), 429 F.3d 370, 404 (2d Cir. 2005).  It is axiomatic that leave to amend a complaint need not be granted, howeve, when amendment would be futile.  Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 71 (2d Cir. 2012). "[W]here a plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner that would survive

---

[10] Plaintiffs' failure to plead scienter relieves the Court of needing to consider SLF's additional arguments in support of its motion to dismiss.

38

dismissal, opportunity to replead is rightfully denied." Hayden
v. Cnty. Of Nassau, 180 F.3d 42, 53 (2d Cir. 1999).

The Amended Complaint is plaintiffs' first attempt to plead
a securities fraud claim against SLF.  Because the Court found
that additional allegations (as proffered in plaintiff's
opposition to SLF's motion to dismiss), if properly plead, might
raise a strong inference of SLF's scienter sufficient to sustain
a section 10(b) claim at the pleading stage, leave to amend will
be granted with regard to plaintiffs' claim against SLF only.
See Absolute Activist Value Master Fund Ltd., 677 F.3d at 71.

V.   APPOINTMENT OF CO-LEAD COUNSEL

Plaintiffs seek appointment of PHGG as co-lead counsel
based upon PHGG's "substantial assistance" to current lead
counsel, Bronstein, Gewirtz & Grossman, LLC ("BG&G"), in
"drafting and preparing" not only the Amended Complaint, but
also plaintiffs' oppositions to CAAS' and SLF's respective
motions to dismiss.  (See Mem. of Law in Support of Pls.' Mot.
to Appoint Co-Lead Counsel ("Pls. Counsel Mem.") (Dkt. No. 49)
at 1.)  In addition, plaintiffs CAAS and SLF oppose the motion,
arguing that plaintiffs have not explained how it will address
"the myriad 'concerns' raised by the appointment of multiple
class counsel."  (CAAS' Mem. of Law in Opp'n to Lead Pls.' Mot.
to Appoint Co-Lead Counsel ("CAAS Counsel Opp'n") (Dkt. No. 50)
at 3.)

Although defendants' "concerns" for plaintiffs' best interests is "altruistic" indeed, courts typically do not credit objections to appointment of (co-)lead counsel by a defendant. See, e.g., In re Pfizer Secs. Litig., --- F.R.D. ---, 2012 WL 1059671, at *8 (S.D.N.Y. Mar. 29, 2012); cf. Brown v. Kelly, 244 F.R.D. 222, 232 (S.D.N.Y. 2007) (finding, in the Rule 23 class certification context, that where "Defendants have attacked . . . the adequacy of class counsel . . . .," their "sudden concern for the best interests of the class is as ironic as it is unconvincing."). Under the PSLRA, it is not even clear that defendants have standing to lodge such objections. See 15 U.S.C. § 87u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to approval of the court, select and retain counsel to represent the class.").

Thus, as the request for appointment of co-lead counsel comes at lead plaintiffs' own request (without objection from its current lead counsel, BG&G, and given the PSLRA's "strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel selection and counsel retention," Varghese v. China Shenghuo Pharm. Holdings, Inc., 589 F. Supp. 2d 388, 398 (S.D.N.Y. 2008) (quotation marks omitted), the Court finds appointment of PHGG appropriate so long as there is "no duplication of attorney's services and that the use of co-lead counsel will not in any way increase

40

attorney's fees and expenses," In re Oxford Health Plans, Inc. Secs. Litig., 182 F.R.D. 42, 50 (S.D.N.Y. 1998); see also Peters v. Jinkosolar Holding Co. Ltd., No. 11 Civ. 7133, 2012 WL 946875, at *12 (S.D.N.Y. Mar. 19, 2012) (same).

BG&G and PHGG are directed to submit an affidavit to the Court setting forth whether and how they have (i) "implemented procedures to limit legal fees and costs, including dividing labor among counsel for the sake of efficiency"; (ii) "require[e] approval for significant expenses"; and (iii) "negotiated a competitive fee arrangement with plaintiffs." See In re Bank of Am. Corp. Secs., Derivative & ERISA Litig., 258 F.R.D. 260, 271 (S.D.N.Y. 2008).

Accordingly, plaintiffs' motion to appoint PHGG is conditionally granted pending submission and review of the above-ordered affidavit.

VI.  CONCLUSION

For the aforementioned reasons, CAAS's motion to dismiss is DENIED and SLF's motion to dismiss is GRANTED.

In addition, plaintiffs' motion for appointment of Pomerantz Haudek Grossman & Gross LLP as co-lead counsel is conditionally granted.  Co-lead counsel shall submit an affidavit to the Court in accordance with the terms set forth in Part IV, supra, no later than August 17, 2012.

Plaintiffs may submit a further amended complaint no later than August 20, 2012.  SLF may move to dismiss any claims asserted against it in that complaint no later than September 4, 2012, with any opposition thereto due no later than September 14, 2012.  No reply will be necessary.

The Clerk of the Court is directed to terminate the motions at Docket Nos. 26, 38, and 48.


SO ORDERED:

Dated: New York, New York
       August 8, 2012


_____
Katherine B. Forrest
UNITED STATES DISTRICT JUDGE