UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 3, 2013
```

-------------------------------------------------------------X
                                                  :

NANCY GEORGE, ROBERT GEORGE AND  :
RANDALL WHITMAN, on behalf of        :
themselves and all others similarly situated  :

                           :
                      Plaintiffs,  :
                           :

               -v-                  :
                           :

CHINA AUTOMOTIVE SYSTEMS, INC.,    :
HANLIN CHEN, QIZHOU WU, XIE LIPING, :
WONG TSE YIU, WANG SHAOBO, YU    :
SHENGBING, and SCHWARTZ LEVITSKY :
FELDMAN LLP,                    :
                   Defendants.  :
                           :
-------------------------------------------------------------X

11 Civ. 7533 (KBF)

ORDER & OPINION

KATHERINE B. FORREST, District Judge:

      Purported class actions alleging securities laws violations are commenced in this district with frequency.  And with frequency, class certification is granted.  The certified action proceeds along a relatively predictable path of expensive litigation, significant potential loss allegations, and most often, an eventual settlement.  Certification of the class is, therefore, a crucial inflection point in such a case.  Given the enormous ramifications of certifying a class — turning potential losses from relatively small amounts into potentially massive exposure — careful analysis of the factors under Rule 23 is required.  This rigorous analysis is further required by Supreme Court precedent[1] as well as by a judiciary calibrated to be fair and just.

---

[1] Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).

While it is certainly true that many motions for class certification meet the requirements of Rule 23, it is also true that there are those that do not.  This is one that does not.

As set forth in this Court's prior decisions on the motions to dismiss,[2] in this purported class action plaintiffs Nancy and Robert George (spouses) and Randall Whitman, allege that defendants China Automotive Systems, Inc. ("CAAS"), various of its officers and directors,[3] and CAAS' former auditor, Schwartz Levitsky Feldman LLP ("SLF") (together the "CAAS defendants" or "defendants"), made false and misleading statements in securities filings in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), 15 U.S.C. § 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Plaintiff now moves for class certification pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure of a class consisting of:

> [P]urchasers of CAAS common stock, call options and sellers of put options, during the period from May 12, 2009 through and including March 17, 2011 (the "Class Period").[4]

(Aug. 2, 2012 Am. Class Action Compl., ECF No. 59.)

This Court's most significant concern is that the particular named plaintiffs chosen to represent the putative class are subject to unique defenses.  The Court finds that the presence of unique defenses defeats adequacy, typicality, and

---

[2] See Aug. 8, 2012 Op. & Order (ECF No. 56); Sept. 25, 2012 Op. & Order (ECF No. 68).
[3] The officers and directors sued are Hanlin Chen, Qizhou Wu, Xie Liping, Wong Tse Yiu, Wang Shaobo, and Yu Shengbin.
[4] Excluded from the proposed class are defendants, officers and directors of CAAS, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

predominance.  In addition, after an evidentiary hearing at which the Court heard testimony from the experts proffered by the parties, the Court also finds that plaintiffs have failed to show by a preponderance of the evidence that the China Automotive securities at issue — common stock, options, and puts — traded in an efficient market.  In the absence of sufficient proof that the market for the securities at issue was efficient, plaintiffs are not entitled to a presumption of reliance.  In the absence of such a presumption, reliance must be proven on an individualized basis — also defeating predominance.  For all of these reasons, class certification must be denied.[5]

## I.    THE SECURITIES LAW VIOLATIONS ALLEGED

Plaintiffs allege that defendants made a series of false and misleading statements regarding CAAS' accounting for certain convertible notes issued on February 15, 2008 (the "Convertible Notes"), CAAS' operating expenses and other charges against income.  Plaintiffs also allege a series of actionable omissions:  that defendants failed to reveal alleged material deficiencies in the CAAS' internal controls, failed to disclose that the financial results were not prepared in accordance with Generally Accepted Accounting Principles, and failed to disclose that SLF was not licensed to conduct audits in the People's Republic of China.

Plaintiffs allege that until December 31, 2008, CAAS was entitled to classify the Convertible Notes as equity and not as liabilities.  However, a new accounting rule went into effect as of January 1, 2009 (EITF 07-05), which required that the

---

[5] On May 31, 2013, this Court informed the parties that it would deny class certification.  (ECF No. 118.)  This opinion provides the Court's reasoning for that decision, and serves as the Court action from which a Rule 23(f) appeal may be taken.  (See June 5, 2013 Order, ECF No. 119.)

Notes thereafter be classified as liabilities.  In its 2008 Form 10-K, CAAS specifically recognized that EITF 07-05 would require it to evaluate its impact on its financial statements.  Plaintiffs allege that despite the requirements of EITF, defendants continued to classify the Convertible Notes as equity during all of 2009 and the first three quarters of 2010, resulting in a significant misstatement of earnings.

Plaintiffs allege that in December 2010, CAAS announced that it was replacing SLF with PricewaterhouseCoopers LLP ("PWC").  This announcement was followed by a decline in CAAS' stock price.  On March 12, 2011, CAAS disclosed in a press release and Form 8-K that its Form 10-K for 2010 would be delayed due to the prior misclassification of the Convertible Notes; this caused a significant drop in CAAS' stock price.  Ultimately, CAAS issued a restatement of net income for the Class Period.

In order to prove their claims pursuant to Rule 10b-5, plaintiffs must demonstrate the following:

1.  A misstatement of fact or omission;

2.  That is material;

3.  Made with scienter;

4.  A connection between the misrepresentation or omission and the purchase or sale of a security;

5.  Reliance on the misstatement or omission; and

6.  Loss causation.

See, e.g., Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 165 (2008).

A prima facie claim under Section 20(a) — for control person liability in connection with a securities law violation — requires an underlying violation by a controlled person, control of the primary violator by the targeted defendant, and some "meaningful culpable participation" by the targeted defendant. SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

This Court's denial of class certification follows its rigorous review of the requirements of Rule 23 based on evidence from an evidentiary hearing, declarations, and other materials submitted in connection with this motion.

Earlier this year, the Supreme Court reiterated the longstanding proposition that "[r]eliance . . . is an essential element of the § 10 (b) private cause of action." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133  S. Ct. 1184, 1192 (2013) (citation omitted).  The Court noted that proof of reliance ensures that there is a "proper connection between a defendant's misrepresentation and a plaintiff's injury."  Id. (citing Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184 (2011)).

Recognizing the difficulties of proving direct reliance, in Basic Inc. v. Levinson, 485 U.S. 224, 241(1988), the Supreme Court "endorsed the 'fraud-on-the-market' theory, which permits certain Rule 10b-5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public." Amgen, 133 S. Ct. at 1192 (citing Basic, 485 U.S. at 241-249).  The fraud-on-the-

market theory rests on the premise that "certain well developed markets are efficient processors of public information," and therefore that the price of a security at any given time reflects the impoundment (or inclusion) of that information.  Id.

The presumption of reliance is, however, just that — a presumption.  It is rebuttable.  See Amgen, 133 S. Ct. at 1193; Halliburton, 131 S. Ct. at 2185.  "Absent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."  Amgen, 133 S. Ct. at 1193; see also Basic, 485 U.S. at 242.

II.    PLAINTIFFS' TRADING HISTORY

Plaintiffs allege that the corrective disclosure that revealed the fraud occurred on March 17, 2011.  Each of the lead plaintiffs, Nancy and Robert George and Randall Whitman, made post-disclosure purchases.

Plaintiff Nancy George made four post-disclosure purchases.  She made a purchase in August 2011, then again two weeks after the original complaint was filed in this matter (November 2011), and again on March 1, 2012, shortly after the amended complaint was filed.  Nancy George made yet another purchase on February 25, 2013, six weeks after the instant motion for class certification was filed.  At her deposition Nancy George testified that she had purchased stock following the Class Period, and that she had made a profit.

Nancy George provided investing advice to her husband, Robert George. Robert George purchased CAAS securities on five occasions following the issuance

of the alleged corrective disclosure on March 17, 2011.  His last purchase was in March 2012.

Finally, Randall Whitman made several purchases of CAAS securities — his first was  the day after the March 17, 2011, corrective disclosure.

Thus, each of the named plaintiffs increased their holdings of CAAS securities after each had allegedly learned of the fraud.  In total, the named plaintiffs made thirteen post-disclosure purchases.

Each of the three named plaintiffs also engaged in significant "in-and-out" trading activity during the Class Period.  Nancy George engaged in at least three in-and-out transactions.  Defendants assert that she made a profit on these sales. Robert George, her husband, made at least six in-and-out transactions — buying and selling over 10,000 shares.  Defendants assert that some of these transactions were at a profit.  For his part, Randall Whitman engaged in more in-and-out transactions than Nancy and Robert George combined:  a total of fifteen in-and-out transactions during the class period.  At his deposition, Randall Whitman conceded that sometimes he would purchase shares of CAAS stock on one day and sell it the next.  As discussed below, whether the in-and-out purchases resulted in a trading profit is not determinative of the issue on this motion — rather, the point is that the parties will spend significant time and resources on this issue, overwhelming common issues.

### III.   LEGAL REQUIREMENTS FOR CLASS CERTIFICATION

A plaintiff seeking to certify a class must prove by a preponderance of the evidence that its proposed class meets the requirements of Rule 23(a) and, if those requirements are met, that the class is maintainable under at least one of the subdivisions of Rule 23(b).  See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

Rule 23(a) states that a party may be a class representative only if:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The subdivision of Rule 23 that plaintiff seeks to certify a class under is (b)(3), which allows certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); see also In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006) (hereinafter "In re IPO Sec. Litig.").

Rule 23 is not a mere pleading standard.  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule."  Wal-Mart, 131 S. Ct. at 2551.  In evaluating a motion for class certification, a district court is required to make a definitive assessment of Rule 23 requirements, notwithstanding

their overlap with merits issues, and must resolve material factual disputes relevant to each Rule 23 requirement.  See id.; see also Severin v. Project Ohr, Inc., No. 10 Civ. 9696, 2012 WL 2357410, at *4 (S.D.N.Y. June 20, 2012) (citing In re IPO Sec. Litig., 471 F.3d at 27).  The district court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  Teamsters Local 445, 546 F.3d at 204 (quoting In re IPO Sec. Litig., 471 F.3d at 42).

## IV.   RULE 23(A) FACTORS

### A.  Numerosity and Common Questions

Class certification is appropriate if, inter alia, "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A class of more than forty members "presumptively satisfies the numerosity requirement."  Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc., 280 F.R.D. 130, 134 (S.D.N.Y. 2012).  There is no dispute that any class here would be sufficiently numerous.  Defendants do not contest that point, and it is clear that the class, if certified, would be greater than forty individual purchasers.  See In re IndyMac Mortgage-Backed Sec. Litig., No. 09 Civ. 4583, 2012 WL 3553083, at *3 (S.D.N.Y. Aug. 27, 2012).

Commonality is also uncontested on this motion.  Even a single question of law or fact will suffice to satisfy the commonality requirement.  See Marisol A. by Forbes v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997).  Under Wal-Mart, however, merely establishing that plaintiffs are asserting a violation of the same provision of law is not enough.  See Wal-Mart, 131 S. Ct. at 2561-62.  Plaintiffs must assert that

there is at least one "common contention . . . capable of class-wide resolution —
which means that its truth or falsity will resolve an issue that is central to the
validity of each one of the claims in one stroke." Id. at 2551.  The capability for a
common answer to resolve a case is the key, not whether there may be a host of
common questions.  Id.

  Here, the question of whether defendants' disclosures are legally adequate is
itself a sufficient common question to satisfy Rule 23.  That question is common to
all members of the proposed class.

  B.  <u>Typicality and Adequacy</u>

  In the Second Circuit, typicality is satisfied when "each class member's claim
arises from the same course of events and each class member makes similar legal
arguments to prove the defendant's liability."  See <u>In re Flag Telecom Holdings,
Ltd., Sec. Litig.</u>, 574 F.3d 29, 35 (2d Cir. 2009).  While there may be variations in
fact pattern as between the named plaintiffs and other members of the class, if the
same allegedly unlawful conduct was directed at or affected them both, the
typicality requirement is usually met.  See <u>Robidoux v. Celani</u>, 987 F.2d 931, 936-37
(2d Cir. 1993).  The possibility that damages may have to be determined on an
individualized basis is not itself a bar to certification of a class.  See <u>Seijas v.
Republic of Arg.</u>, 606 F.3d 53, 58 (2d Cir. 2010); <u>see also</u> <u>N.J. Carpenters Health
Fund v. Residential Capital, LLC</u>, 272 F.R.D. 160, 165 (S.D.N.Y. 2011) ("Even if, as
Defendants claim, many putative class members suffered no injury, such an
infirmity would not defeat typicality in light of the fact that a showing of the

10

typicality requirement is not demanding." (citation omitted)), aff'd, 477 F. App'x 809 (2d Cir. 2012).

To satisfy the "adequacy" requirement, plaintiffs must prove both that the interests of the named plaintiffs are not antagonistic to other members of the class, and that plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation.  In re Flag Telecom, 574 F.2d at 35.  Courts have generally found that if a named plaintiff's claims satisfy the typicality requirement, he or she is also adequate to represent the class.  Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008); see also Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071, 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (finding class representatives were adequate when the complaint alleged a common course of conduct and unitary legal theory for the entire class period).

Defendants argue that plaintiffs cannot meet the typicality or adequacy requirements because their claims are subject to unique defenses.  The presence of unique defenses may, in certain cases, defeat class certification.  See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation . . . [r]egardless of whether the issue is framed in terms of the typicality of the representatives claims . . . or the adequacy of the representation."); Rocco v. Nam Tai Elecs., Inc., 245 F.R.D. 131, 135-36 (S.D.N.Y. 2007) (finding numerous post-class purchases raised the possibility of unique defenses which

11

threatened to become a focus of the litigation, defeating typicality); <u>Berwecky v. Bear, Stearns & Co.</u>, 197 F.R.D. 65, 69-70 (S.D.N.Y. 2000) (finding certain plaintiffs atypical and inadequate class representatives when they had engaged in post disclosure purchases); <u>Greenspan v. Brassler</u>, 78 F.R.D. 130, 132 (S.D.N.Y. 1978) (finding post-disclosure purchase rendered named plaintiffs atypical and inappropriate as class representatives).

In <u>Gary Plastics</u>, the Second Circuit affirmed the district court's denial of class certification where plaintiff continued purchasing the securities at issue despite having received notice of, and having investigated, the alleged fraud.  <u>Gary Plastics</u>, 903 F.2d at 179-80.  Such post-disclosure purchases can both defeat typicality and adequacy as well as rebut the presumption that plaintiff relied on the alleged misrepresentations or the integrity of the market in making his or her purchases.

In <u>Flag Telecom</u>, the Second Circuit affirmed a finding that certain class representatives failed the typicality requirement for Rule 23 since they were subject to unique defenses as a result of having been "in-and-out" purchases (buying and selling into and out of the securities at issue during the class period).  <u>Flag Telecom</u>, 574 F.3d at 40-41; <u>see also</u> <u>Kline v. Wolf</u>, 88 F.R.D. 696, 699 (S.D.N.Y. 1981) (denying class certification in part because a named plaintiff was an in-and-out trader and therefore faced unique defenses), <u>aff'd</u>, 702 F.2d 400 (2d Cir. 1983); <u>Bensley v. FalconStor Software, Inc.</u>, 277 F.R.D. 231, 237-41 (E.D.N.Y. 2011) (refusing to appoint fund, an in-and-out investor, as lead plaintiff because it was

subject to unique defenses); <u>In re Bally Total Fitness Sec. Litig.</u>, No. 04C3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005) (refusing to appoint in-and-out trader as lead plaintiff because it would have to establish that losses were actually caused by the alleged fraudulent statements and would need to expend considerable resources to do so); <u>c.f.</u> <u>In re Smart Techs., Inc.</u>, No. 11 Civ. 7673, 2013 WL 139559, at *9 (S.D.N.Y. Jan. 11, 2013) (excluding in-and-out purchasers from the class).

Here, as discussed above, all three named plaintiffs continued to make purchases of the securities at issue following the alleged "truthful" disclosure. A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision. Defendants may assert that the disclosure of the fraud was irrelevant to the named plaintiffs as demonstrated by their pattern of continued purchasing. In fact, defendants have stated an intention to aggressively pursue this line of inquiry. This will require that each of the named plaintiffs expend considerable time on unique defenses — precisely the situation the case law does not condone.

In addition to these post-disclosure purchases, each of the named plaintiffs was an in-and-out trader during the class period. At oral argument on this motion, counsel for plaintiff argued that excluding in-and-out purchasers would make no sense in many securities cases given the number of institutional investors who routinely made in-and-out trades. This argument misses the point and ignores the law. First, none of the three named plaintiffs in this case is an institutional

investor.  Second, as set forth above, a number of courts have found that in-and-out traders may be subject to unique defenses, making them inadequate class representatives.[6]

As in-and-out traders, the named plaintiffs again subject themselves to unique inquiries regarding their trading patterns and why they made investment decisions, whether the fraud was in fact irrelevant to their purchasing and sale decisions, and whether on individual trades they profited.  These inquiries will also require considerable time and resources and indeed threaten to become the focus of the litigation.

Given the trading patterns of the three named plaintiffs, it is certain that defendants will search out every individual angle and defense in relation to them. Given their factual circumstances, these three named plaintiffs are neither typical nor adequate.[7]  As such, they cannot represent the class, and therefore class certification must be denied on these bases alone.  (Either basis would be sufficient separately to deny certification, together they simply multiply the problems with certification).

C. <u>Predominance</u>

In addition to having to meet each of the requirements of Rule 23(a) by a preponderance of the evidence (which the named plaintiffs have here failed to do),

---

[6] When asked at oral argument how many purchasers of CAAS securities were institutional investors, plaintiff's proposed expert, Kenneth N. Kotz, stated that 25% were.

[7] The only way that plaintiffs could conceivably prove otherwise would be to have submitted proof that would establish by a preponderance of the evidence that their trading patterns were in fact typical of the class.  This they did not do.

plaintiffs must also meet the requirements of Rule 23(b)(3), referred to as the "predominance" requirement.  They have failed to carry this burden.

Predominance tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation.  Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). "The requirement's purpose is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Myers, 624 F.3d at 547 (internal quotations and citations omitted).  "Economies of time, effort and expense in fully resolving each plaintiff's claims will only be served, and the predominance requirement satisfied, if the plaintiffs can show that" the question at issue can be "answered with respect to the members of the class as a whole through generalized proof and that those common issues are more substantial than individualized ones." Id. at 549 (quotations and citations omitted).

 "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these issues are more substantial than the issues subject only to individualized proof."  UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 131 (2d Cir. 2010).  The existence of some individualized issues does not necessarily defeat predominance — it is a question of the balance.  See

15

Pub. Emps.' Ret. Sys. of Miss., 277 F.R.D. at 111-19; In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 75-77 (S.D.N.Y. 2009).

Class certification is only warranted if plaintiffs can establish by a preponderance of the evidence a class-wide presumption of reliance by virtue of the presence of an efficient market critical to the fraud-on-the-market theory.  See Basic, 485 U.S. at 241-42 (holding that plaintiffs may be entitled to a presumption of reliance on material misstatements or omissions to the extent that securities they have purchased traded in an efficient market which impounded all such information into the price of the security).

In the absence of this presumption of reliance on a market that absorbs the alleged material misstatements and omissions, questions as to whether any particular investor in fact relied on any particular misstatement or omission come to the fore and may overwhelm the common questions.  In such a situation, resolution through representative class action is neither feasible nor a superior means of adjudication.  See Fed. R. Civ. P. 23(b)(3); see also Basic, 485 U.S. at 241-42 ("The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.").  In part, this is because in an efficient market, the price of the stock reflects all material information.  Id. (holding that investors who purchase based on the integrity of the market stock are thereby misled by any misstatements or omissions, even if they do

not directly rely on them); see also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig., 281 F.R.D. 174, 177 (S.D.N.Y. 2012).

In order for the fraud-on-the-market theory to apply, plaintiffs must demonstrate that the securities at issue traded in an efficient market. In the absence of an efficient market, it is not clear that the assumptions underlying the fraud-on-the-market theory can or should apply; whether certain material information (including the alleged misstatements or omissions) was impounded into the stock price cannot be assumed to have occurred. See Basic, 485 U.S. at 241-242.

Here, defendants assert that plaintiffs have failed to carry their burden of showing by a preponderance of the evidence that CAAS securities traded in an efficient market. In the absence of reliance on a demonstrated efficient market, each class member would be required to demonstrate his or her own reliance on the particular misstatements or omissions; the need for such individualized showings would overwhelm common issues.

Courts have generally described three forms of the efficient market hypothesis — the third of which, as noted below, has now been widely discredited:

> First is the weak form, which asserts simply that the current share price in an efficient market reflects all information about past share prices. If the weak form of the hypothesis accurately describes a market, it is impossible to predict future prices using only past prices. Second, the semi-strong form, which asserts that a share price in an efficient market reflects all public information concerning the security (including but not limited to past share prices). Third, the strong form, which asserts all relevant information, public and private, is reflected in the price of the securities in an efficient market. The strong form has been widely discredited.

In re Initial Pub. Offering Sec. Litig., 260 F.R.D. 81, 98 n.148 (S.D.N.Y. 2009); see also Freddie Mac, 281 F.R.D. at 177.  The Second Circuit has stated that the semi-strong theory supports the fraud on the market theory.  See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 n.4 (2d Cir. 2007).

In seeking class certification, plaintiffs relying on the fraud-on-the market theory to establish reliance bear the burden of proving market efficiency by a preponderance of the evidence.  To defeat the presumption of reliance, defendants do not, therefore, have to show an inefficient market.  They must, however, demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark.  That is precisely what defendants have done here.

In analyzing market efficiency, courts generally refer to a series of factors set forth in Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); see Teamsters, 546 F.3d at 200.  The factors are:

1.   The average weekly trading volume of the securities at issue;

2.   The number of securities analysts reporting on or following the securities;

3.   The extent to which market makers traded in the securities;

4.   The extent to which the issuer was/is eligible to file an SEC Registration Form S-3; and

5.   The demonstration of a cause and effect relationship between the unexpected, material disclosures and changes in the securities' price.

Id. The presence or absence of some factors (for instance, the average weekly trading volume and the eligibility to file a Form S-3) is not determinative of market efficiency. Id. Here, defendants do not contest any of the Cammer factors except for the last — the cause and effect relationship. According to defendants' expert (Daniel M. Garrett), the first four factors are structural factors: they set up or are reflective of a market in which shares can be traded efficiently. (May 30, 2013 Tr. ("Tr.") 82.) The final factor demonstrates whether the market is in fact efficient through showing cause and effect. Id.

Both plaintiffs and defendants submitted expert declarations in connection with the motion for class certification. Plaintiffs submitted initial and reply declarations from Kenneth N. Kotz, a Vice President of Forensic Economics in Rochester, New York.[8] Defendants submitted a declaration from Daniel M. Garrett, Ph.D., a Vice President of Cornerstone Research. Both experts opined exclusively on the issue of market efficiency: Kotz performed five analyses that he opines support a finding of market efficiency; Garrett's declaration addresses issues and problems he perceives with regard to each of Kotz's analyses. Garrett concludes that as a result of flaws in Kotz's analyses, he "has failed to establish that CAAS traded in an efficient market during the Class Period. In particular, Kotz has failed

---

[8] The Court did not find Kotz to be particularly confident or articulate regarding his opinions. Plaintiffs' counsel frequently referred him to slides or specific portions of his report to assist him in answering questions. Certain questions that went to key issues were done in a leading manner and therefore this Court discounts them as being the opinions of the expert; they appeared to be the wishful words of counsel as adopted by Kotz. Kotz conceded that while he has worked on dozens of cases in securities class actions analyzing market efficiency, he has never found an inefficient market. (Tr. 16-17.) Prior to this case, Kotz himself had never presented opinions on market efficiency. (Tr. 47.) Prior to this case, he had also never analyzed market efficiency in the context of a Chinese-based reverse merger. (Tr. 34.)

to establish that CAAS' stock price consistently reacted to new, value-relevant information, which is the essence of market efficiency." (Mar. 8, 2013 Garrett Decl. ¶ 6, ECF No. 88 ("Garrett Decl.").)

The Court initially held oral argument on the motion for class certification on May 7, 2013. The Court then held an evidentiary hearing on May 30, 2013, at which the parties examined and cross-examined the proffered experts. The evidentiary hearing was particularly useful in this matter to assist the Court in understanding the parties' analyses and to assess the credibility of the analytical work performed. The Court finds that, as Garrett opined, Kotz did not perform analyses which are sufficiently supportive of CAAS securities trading in an efficient market. Plaintiffs have therefore failed to carry their burden on this issue by a preponderance of the credible evidence. Accordingly, plaintiffs are unable to rely on CAAS securities trading in an efficient market in order to obtain the presumption of reliance. As a result, reliance would need to be proven on an individualized basis, defeating predominance. Class certification is also denied on this basis.

1.  The Kotz analyses

Kotz testified that his definition of an efficient market is one in which all publicly available information is quickly impounded into the stock price. (Tr. 48.) This is consistent with the definition set forth in the case law. See, e.g., Amgen, 133 S. Ct. at 1190; Basic, 485 U.S. at 244. Kotz performed five analyses which the experts agreed to refer to as Kotz 1, Kotz 2, Kotz 3, Kotz 4(a), and Kotz 4(b). None of these demonstrate an efficient market by a preponderance of the evidence. Only

one of the tests, Kotz 4(b), was methodologically akin to an event study. As courts have noted, event studies are the most reliable way of demonstrating market efficiency. See, e.g., In re Omnicom Grp., Inc. Secs. Litig., 597 F.3d 501, 511-12 (2d Cir. 2010); see also Wagner v. Barrick Gold Corp., 251 F.R.D. 112, 120 n.7 (S.D.N.Y. 2008).

> a. Kotz 1: Speed of price reaction to new information.

The first analysis that Kotz performed purported to test the speed of price reaction in the CAAS stock to new information. In this test, Kotz first identified the days on which CAAS stock had the largest excess returns, identified by their t-statistics. He then looked to see whether there was a statistically significant return on the following day. If the following day did not have a statistically significant return, he opined that it was an indication of an efficient market. In this test Kotz assumes that the largest returns associated with the CAAS stock are a proxy for news events that resulted in an impact on the stock price. At the evidentiary hearing, Kotz conceded that "this test pays no attention to what news, if any, was released" on the days with the largest returns (or t-statistics associated with the largest returns). (Tr. 51-52.)

This test suffers from a fatal logical flaw: it purports to test whether or not information is efficiently impounded into the CAAS stock price without looking at whether the days in which there was price movement had any news actually associated with them (it takes the event out of "event study."). At the evidentiary hearing, Garrett testified that in Kotz 1, Kotz looked at the thirteen days with the

highest t-statistics and assumes that those are days associated with information releases, and then looks at the subsequent thirteen days to see if they have a statistically significant stock price change.  (<u>Id.</u> at 88.)  Garrett identifies several deficiencies with this approach:  first, that Kotz is simply assuming that there is information released on the first thirteen days, and second, that there is no information released on the subsequent thirteen days.  (<u>Id.</u>)  It could be the case that Kotz's assumptions are correct or incorrect.  If they are incorrect (which Kotz did not determine) then the market would be inefficient rather than efficient — the CAAS stock would be reacting without any news event, and not reacting with a news event.  This possibility was not tested.  Thus, Kotz 1 is based upon a flawed methodology.

<blockquote>b. <u>Kotz 2: Proportion of news/no news days with statistically significant returns</u>.</blockquote>

In Kotz 2, he compares the proportion of statistically significant "news" and "no news" days.  Kotz starts with any days during the Class Period during which there were "headlines" relating to CAAS.  (<u>Id.</u> at 44.)  He determined that there were 338 such days in which a headline appeared.  (<u>Id.</u>)  He testified at the hearing that the proportion of days on which there were statistically significant returns compared to non-headline days — a four-to-one ratio.  (<u>Id.</u> at 53.)  On cross-examination, Kotz agreed that he could not opine on whether that ratio was itself statistically significant (<u>id.</u> at 53), because to do so one would have to have a certain number of observations in each category and he did not (<u>id.</u> at 53-54).  He agreed

that this test would not provide a standalone basis for testing whether a market was efficient.  (Id. at 54.)[9]

          c.   Kotz 3: Correlation of stock returns with trading volume.

In this test, Kotz performs "an objective assessment of whether price movements are associated with trading volumes."  (Apr. 8, 2013 Kotz Reply Decl. ¶ 26, ECF No. 102 ("Kotz Reply").)  He concedes that it does not analyze specific news but instead concentrates on daily traded share volume and the magnitude of excess returns.  (Id. ¶ 25.)  Kotz urges that volume should be taken as a proxy for information.  (Id. ¶ 28.)

Garrett testified that this test has no support in the academic literature, and Kotz conceded as much in paragraph 27 of his reply declaration and at the evidentiary hearing.  (Tr. 57.)

Garrett testified credibly and comprehensibly that this test does not support a conclusion of an efficient market and that "[i]t's equally consistent with an efficient market and a herd of wildebeests — when the wildebeests roam into the market, there's more stock price change."  (Id. at 93.)  As Kotz stated, this test does not measure whether any specific news or information related to the company was disclosed on the dates he identified.  (Id. at 57.)  The key to market efficiency — as

---

[9] During the first argument on the motion to certify the class, counsel referred the Court to Billhofer v. Flamel Techns., S.A., 281 F.R.D. 150 (S.D.N.Y. 2012), as support for the use of Kotz 2.  The Court reviewed that case and also reviewed the expert materials underlying that case.  The test run there was not the same as that which Kotz ran in Kotz 2.  Kotz conceded as much at the evidentiary hearing.  (Tr. 57.)  Garrett agreed that the test performed in the Billhofer was not the same as Kotz 2.  (Id. at 92.)

Kotz himself agreed, is testing that which he did not test:  whether information or news is impounded into the stock price.

        d.   <u>Kotz 4(a): Reaction to news</u>.

Kotz 4(a) most closely approximates an event study — but even so, it suffers from serious and fatal methodological flaws.  In this test, Kotz states that he predefined events for CAAS that were expected to impact the stock price: analyst rating changes and earnings guidance releases.  (Kotz Reply ¶ 32.)  He identified sixteen such events during the Class Period.[10]

Kotz opines that even though there are sixteen identified events, not all are expected to be associated with statistically significant excess returns.  He points to language in a case from the district court in Pennsylvania as supportive of this position.[11]

Out of the sixteen days identified, Kotz found seven that had statistically significant stock movement.  (<u>Id.</u> ¶ 34.)  He additionally found one day on which there was a statistically significant price movement that was directionally inconsistent with what he would have expected.  (<u>Id.</u>)  Put another way, out of the sixteen days identified as significant news days, Kotz found that on only 50% of

---

[10] In his initial report, he identified only fifteen such events, but at his deposition a sixteenth event was brought to his attention, and he included the results of that event in his reply declaration.  (Kotz Reply ¶¶ 32-33.)

[11] <u>In re DVI Sec. Litig.</u>, 249 F.R.D. 196, 211 (E.D.Pa. 2008).  In this case, the Court stated that failure of a news event to result in a price movement could simply be reflective of investor indifference.  This is certainly true, but investor indifference could of course be associated with an inefficient market in which a news event that would — in an efficient market — be associated with a price movement, does not in fact cause any movement (or the directionally expected movement) at all.  Thus, this Court does not find that <u>DVI</u> should be cited for an approving proposition that a news event that fails to result in price movement nonetheless supports an efficient market:  it might or it might not; and in <u>DVI</u> the Court said no more than that.  The Court here agrees that there are potentially news days when there would not be price movement because such news was, for instance, previously anticipated.

those days was there statistically significant price movement and one of those days was in the wrong direction.  (Tr. 23.)

In addition, Kotz testified on cross-examination that of the sixteen identified days, one quarter had stock movement that was actually directionally inconsistent. (Id. at 60.)  (Only one of those directionally inconsistent days was associated with a statistically significant stock movement.)

As Garrett testified, the market should react to new material information. The Court agrees with and credits his criticism of Kotz 4(a) in that it does not make a determination of material or non-material — and therefore must assume that when 50% of the identified days do not have statistically significant returns the days simply must not matter.  However, those days might in fact be days on which there was something material, and in that event, a lack of price movement could well signify an inefficiency.  Kotz 4(a) does not account for this possibility.  (See, e.g., id. at 89-90, 98.)  As Garrett testified:

> The truth is when you have a company announcement and there's not a stock price reaction two things could be true.  One is the information isn't material and the other is it's material but the market's not reacting . . . . [I]f it's truly not material and the market doesn't react, that's not inconsistent with an efficient market.   But if it's material and the market doesn't react, obviously there's a problem.

(Id. at 98-99.)

Even assuming that the methodology was proper, showing that only seven out of sixteen days resulted in a market reaction is an insufficient foundation upon

which to pronounce market efficiency.  (Id. at 100.)  (To state the obvious, seven out of sixteen is less than 50%.)[12]

        e.   Kotz 4(b): Analysis of the days with the largest t-statistics.

In this test, based on the t-statistics of certain days during the Class Period, Kotz identified the days in which the largest single day price movements occurred. At the evidentiary hearing, Kotz conceded that he started his analysis with the days in which he had identified the largest t-statistics and then went back to see what if any news was associated with those days that might explain the stock price movement.  (Id. at 67.)  Kotz selected the days with the ten highest t-statistics for this test.  At the evidentiary hearing, he conceded that he had not seen any academic literature which suggested that choosing a sample of ten was an appropriate number.  (Id. at 71.)

Of the top ten days (with the highest t-statistics), Kotz then found that on four there was no relevant news concerning China Automotive or the Chinese automotive industry in general, two days involved only the Chinese automotive industry in general, and four out of the ten days actually involved news relating to China Automotive.[13]  (Id. at 72.)  Kotz agreed that "the most that one could conclude

---

[12] Plaintiff urges that out of the sixteen identified days, only seven should be considered for this test; and that of the seven, five were directionally consistent and that this proportion is far higher than 50%.  As a matter of math this is true, but as a theoretical matter, it remains true that Kotz did not look "under the hood" at the eight days which did not have statistically significant returns to insure that they were not material and that the failure to see statistically significant price movement was consistent with his opinion.

[13] Garrett's report identifies this random choice of choosing ten days as the correct sample date as a methodological flaw.  (Garrett Decl. ¶ 29.)  Garrett also identifies as a flaw using the t-statistics as an initial method of identifying significant days and then from that reviewing whether there was news.  According to Garrett that methodology is backwards.  Based on the bases Garrett sets forth for this view, the Court credits this criticism.  (See id. ¶¶ 30-35.)

from this, is that sometimes the largest single day movements in China Automotive stock were associated with relevant news and sometimes they weren't."  (Id.) According to Kotz, this is nonetheless still "consistent" with an efficient market. (Id.)  That may be true, but plaintiffs' burden is higher than showing mere consistency; they bear the burden of showing market efficiency by a preponderance of the evidence.

* * *

At the evidentiary hearing the Court was able to explore the bases for Kotz's and Garrett's opinions.  The Court finds that Garrett provided complete and sound examples of the methodological shortcomings of each of Kotz's tests.  In contrast, the Court found that Kotz could not explain or defend why his methodology made analytical sense given the definition of market efficiency.

None of the tests utilized by Kotz provides a reliable basis upon which to rest an opinion or evidence of market efficiency.  On that basis alone, plaintiffs have failed to carry their burden of proof on the issue of market efficiency and therefore predominance.  But more than that, the Court finds that Kotz's results are in fact more supportive than not of market inefficiency.  While defendants do not bear the burden of showing market inefficiency, the Court cannot help but note the numerous days during the Class Period when news events did not result in price movement, or statistically significant price movement was not associated with a news event.  Taken with the methodological flaws, this cannot be ignored.

Plaintiffs have not proven market efficiency by a preponderance of the evidence.

V.     CONCLUSION

Plaintiffs' motion for class certification fails for the various, independent reasons set forth above.

SO ORDERED.

Dated: New York, New York
        July 3, 2013

_____
        KATHERINE B. FORREST
        United States District Judge